IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROBERT VASQUEZ,

      Plaintiff,

v.                                    No. Civ. 1:22-cv-00462 JCH-KK

CORRECTION OFFICER GERARDO PEREZ,
in his individual and official capacity,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This case arises from an incident in which Plaintiff Robert Vasquez, an inmate at the North Penitentiary of New Mexico, was pepper sprayed and slammed to the ground by Defendant Gerardo Perez, a New Mexico Corrections Department Correctional Officer. Plaintiff asserts a claim for excessive force in violation of the Eighth Amendment. Third Am. Comp. ¶ 18, Dkt. No. 74. Defendant Perez filed a *Motion for Summary Judgment* (Dkt. No. 104). Having considered the motion, response, reply, and evidence, the Court concludes that the motion for summary judgment should be granted and that this case should be dismissed.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the lawsuit and a dispute is "genuine" if the evidence presented could allow a rational jury to find in favor of the non-moving party. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citation omitted). Summary judgment "is proper when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law.'" *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). In considering a summary judgment motion, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Id.*; *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021).

When a defendant asserts qualified immunity on summary judgment, the plaintiff bears the burden of demonstrating both that (1) the defendant violated a federal constitutional or statutory right; and (2) the right violated was clearly established at the time of the defendant's conduct. *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018). Only if the plaintiff meets this two-part test does the defendant bear the traditional movant's burden on summary judgment. *Id.* The Tenth Circuit has described this test as a "heavy two-part burden," established to protect "all but the plainly incompetent or those who knowingly violate the law." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016) (internal quotations and citations omitted). "To qualify as clearly established, a constitutional right must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Redmond*, 882 F.3d at 935 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). Existing precedent, through either an on-point Supreme Court or Tenth Circuit case, or the clearly established weight of authority from other circuits, must have placed the constitutional issue beyond debate. *Id.*

The incident in this case was captured on video. Where there is a video recording capturing the events in question, a court should view the facts in the light depicted by the video recording. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Consequently, the facts set forth in the next section are drawn from the

undisputed evidence; the video recording; and, for the facts not conclusively established in the video recording, those facts that are supported by admissible evidence and construed in the light most favorable to Plaintiff, the non-moving party.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff and his role as a porter

Plaintiff Vasquez has been incarcerated since 2010 and is an inmate of the New Mexico Corrections Department ("NMCD"). *See* Def.'s Mot. for Summ. J., Undisputed Fact ("Def.'s UF") ¶ 2, Dkt. No. 104.[1] On January 6, 2022, Mr. Vasquez was incarcerated at the North Penitentiary of New Mexico and housed in the G-Pod. Def.'s UF ¶¶ 3-4, Dkt. No. 104. At approximately 6:20 p.m., Mr. Vasquez was working as a porter out of his cell and cleaning in an area marked "Diner." *See* Def.'s UF ¶¶ 4, 16, Dkt. No. 104. As a porter, he had the responsibility of cleaning, including trash and staff restrooms. *See id.*; Vasquez Decl. ¶ 5, Dkt. No. 117 at 36 of 59. While working, his legs were chained, but his hands and wrists were not restrained. *See* Def.'s Ex. K at 6:22:54-6:22:58 p.m, Dkt. No. 106.

### B.    North Penitentiary of New Mexico's layout and staff

The North Facility consisted of three buildings that house inmates, including six housing units ("HU") (1A, 1B, 2A, 2B, 3A, and 3B). Lindsey Supp. Decl. ¶ 2, Dkt. No. 120-1. Each housing unit has four pods. *Id.* The HU 1B unit has E, F, G, and H Pods. Def.'s UF ¶ 16, Dkt. No. 104. Each pod has an entry door with individual cells inside the pod. Perez Decl. ¶ 3, Dkt. No. 104-5. The G-Pod shared the HU 1B corridor with F-Pod. *Id.* ¶ 4.

On the evening of January 6, 2022, Lieutenant Charles Lindsey was working as the shift supervisor for the entire North Facility. Lindsey Decl. ¶ 7, Dkt. No. 104-7; Lindsey Supp. Decl. ¶

---

[1] Defendant's Undisputed Facts refer to those facts to which Plaintiff admits in the corresponding enumerated paragraphs in his response (Dkt. No. 117).

2, Dkt. No. 120-1. He worked the Morning Watch Shift (also called the Night Shift), which is from 6:00 p.m. to 6:00 a.m. Def.'s UF ¶ 6, Dkt. No. 104; Lindsey Decl. ¶ 7, Dkt. No. 104-7.

Defendant Gerardo Perez, an NMCD Correctional Officer ("CO"), was working the Morning Watch Shift as the North Penitentiary HU 2A Rover. Def.'s UF ¶ 5, Dkt. No. 104. Officer Perez had some knowledge that Mr. Vasquez had a disciplinary history. *See* Def.'s Ex. E ¶ 14, Dkt. No. 104-5; Pl.'s Resp. 1, Dkt. No. 117. Officer Perez had threatened Mr. Vasquez in a prior incident on the way to rec. *See* Vasquez Decl. 11, ¶ 24, Dkt. No. 117 at 45 of 59.

Officer Perez also served as an "A-Team Responder." Def.'s UF ¶ 5, Dkt. No. 104. A-Team Responders have the responsibility of immediately responding to emergencies, such as when an inmate overdoses or has a medical or other emergency. Def.'s UF ¶ 7, Dkt. No. 104. That evening, Correctional Officers Bill Till, Irvin Toya, and Perez were working as first responders. *See* Def.'s Ex. M, Dkt. No. 104-9; Lindsey Supp. Decl. ¶¶ 3, 9-11.

### C. Medical emergency of Inmate AC

At around 6:20 p.m. that evening, Correctional Officer Arthur Geoffroin advised North Facility Control that first responders were needed in the HU 1B F-Pod. Def.'s UF ¶ 11, Dkt. No. 104. Officer Geoffroin reported that an inmate (herein, "Inmate AC") was possibly seizing on the floor of his cell in F-Pod. Lindsey Decl. ¶ 9, Dkt. No. 104-7; Perez Supp. Decl. ¶ 3, Dkt. No. 120-2. Medical staff and A-Team Responders were dispatched to secure Inmate AC and provide necessary medical attention. Lindsay Decl. ¶ 9, Dkt. No. 104-7. Officers Perez, Toya, and Till responded to HU 1B. Def.'s UF ¶¶ 8, 12, Dkt. No. 104.

### D. Timing of response team's arrival at Inmate AC's cell

The parties dispute when the officers arrived at Inmate AC's cell and assisted in the medical emergency. Plaintiff asserts that the "officers appeared to assist [Inmate AC] in F-Pod within

4

seconds after first called on the emergency at 6:20." Pl.'s Resp. 3, ¶ 12, Dkt. No. 117. In support

of this assertion, Plaintiff relies on the initial declarations of Lt. Lindsey, Officer Perez, and Officer

Toya. *See id.* at 3-4. Officers Perez and Toya stated in their respective declarations that they

"responded" to the emergency at approximately 6:20 p.m. *See* Perez Decl. ¶ 3, Dkt. No. 104-5;

Toya Decl. ¶ 2, Dkt. No. 104-5. Plaintiff also cites Lt. Lindsey's Declaration wherein he avers that,

after Officer Geoffrion reported Inmate AC's medical situation at around 6:20 p.m., Lt. Lindsey

made his way from his office to assist with the incident. Lindsey Decl. ¶ 9, Dkt. No. 104-7. After

inferring a response time of "seconds," Plaintiff further infers that Officers Toya and Perez

encountered Plaintiff Vasquez *after* the medical emergency resolved.

Plaintiff's timeframe of "seconds" is not supported by evidence in the record, even when

construing inferences in his favor. Officer Toya stated that he "responded" at approximately 6:20

p.m. Toya Decl. ¶ 2, Dkt. No. 104-6. But he also said that he moved through the diner corridor

towards the unresponsive inmate when he noticed Mr. Vasquez cleaning the floor and master

control calling out that all inmates were to be locked down. *Id.* ¶¶ 2-4. He explained that Officer

Perez joined them at that point. *Id.* ¶ 3. Officer Toya's Declaration does not support Plaintiff's

assertion that Officer Toya arrived at Inmate AC's cell within seconds of Officer Geoffrion's call

for assistance or that his encounter with Mr. Vasquez occurred after he assisted with the medical

emergency. *See id.* ¶¶ 2-8.

Officer Perez's Declaration likewise does not support Plaintiff's timeframe. Although

Officer Perez stated that he "responded" to the emergency at around 6:20 p.m., he also said that

he was assigned to the HU 2A unit, and that on arrival at the HU 1B unit, he was advised by control

that Mr. Vasquez needed to be locked down "due to the ongoing emergency in F-Pod." Perez Decl.

¶¶ 2-4, Dkt. No. 104-5. The inference that Officer Perez arrived at Inmate AC's cell within seconds

of hearing of the emergency and encountered Mr. Vasquez *after* the medical emergency was over is not plausible based on the complete contents of Officer Perez's Declaration. Furthermore, Officer Perez clarified the timeframe in his Supplemental Declaration. *See* Perez Supp. Decl. ¶¶ 2-18, Dkt. No. 120-2. Officer Perez avers that he was in Housing Unit 2A when the emergency radio announcement was made, so he immediately left HU 2A and ran toward HU 1B. Perez Supp. Decl. ¶ 4, Dkt. No. 120-2. He entered the exterior door of HU 1B at 6:22:09 p.m., which is shown in the video evidence. *Id.* ¶ 5; Ex. K at 6:22:09, Dkt. No. 106. Consequently, Plaintiff cannot support his assertion that Officer Perez assisted Inmate AC within seconds based on Officer Perez's Declaration.

Plaintiff also relies on paragraph 9 of Lt. Lindsey's Declaration wherein he says that Officer Geoffrion informed master control at around 6:20 p.m. that Inmate AC was possibly seizing, that officers were dispatched, and that Lt. Lindsey made his way from his office to assist with the incident. Lindsey Decl. ¶ 9, Dkt. No. 104-7. He then explained that, because of the medical emergency, the call went out to lockdown at 6:21 p.m. *Id.* ¶ 10. Lt. Lindsey's Declaration thus does not support Plaintiff's assertion that all the responders arrived at Inmate AC's cell within seconds and resolved the medical emergency before Officer Perez encountered Mr. Vasquez. *See id.* ¶¶ 9-10. Moreover, to clarify the timeframe, Defendants submitted Lt. Lindsey's Supplemental Declaration wherein he explained that it took several minutes for him to arrive at Inmate AC's cell. Lindsey Supp. Decl. ¶¶ 5-10, Dkt. No. 120-1. Lt. Lindsey's office is in another building separate from the F-Pod. *Id.* ¶ 5. He left his office, exited the building, went towards F-Pod, and had to wait for doors and a gate to be unlocked. *See id.* At approximately 6:21 p.m., Lt. Lindsey ordered that inmates lock down. *Id.* ¶ 4. It took Lt. Lindsey several minutes to reach the F-Pod. Id. ¶ 6. Lt. Lindsey further averred that medical staff likewise would have traveled through locked

doors and gates to reach the F-Pod, so it would generally take several minutes to get to the F-Pod. *Id.* ¶ 7. Finally, he clarified that Officers Perez and Toya did not enter the cell to assist Inmate AC until approximately 6:28 p.m. *Id.* ¶ 10. Accordingly, Lt. Lindsey's Declaration also does not support Plaintiff's contention that the first responders arrived at Inmate AC's cell within seconds.

Finally, in support of his version of the timing, Plaintiff relies on his own deposition testimony wherein he testified that Officer Toya, when he initially encountered Plaintiff, had come from the emergency situation and told him to lock down because something was going on. *See* Pl.'s Resp. 5-6, ¶ 17, Dkt. No. 117; Vasquez Dep. 52:8-16, Dkt. No. 104-11 (stating that Officer Toya "had c[o]me from the emergency situation and – and told me to finish it – to wrap it up, lock it down, that there was something going on"). First, Mr. Vasquez's testimony does not suggest that the medical emergency was over; rather it indicates it was ongoing. Second, there is nothing in the record to suggest that Plaintiff had personal knowledge that Officer Toya had already responded to the incident or that there was no longer a medical emergency.

For all these reasons, the Court finds that Plaintiff failed to dispute the timeframe as to when the officers responded to Inmate AC's cell or when the medical emergency resolved with admissible evidence based on personal knowledge, as required by Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56(c)(4). Because Plaintiff failed to create a genuine issue of material fact with respect to when the officers were able to respond to the medical emergency, the Court finds for purposes of ruling on this motion that Officers Toya and Perez did not reach Inmate AC's cell within seconds, but rather around 6:28 p.m., and that the medical emergency was ongoing at the time Officers Toya and Perez encountered Mr. Vasquez.

### E.  Use of force encounter between Plaintiff and Defendants Perez and Toya

Officer Toya moved through the diner corridor towards where Inmate AC was located.

Toya Decl. ¶ 2, Dkt. No. 104-6. In the diner corridor, Officer Toya encountered Mr. Vasquez and told him that he needed to wrap it up because there was "some type of incident in F pod." Vasquez Dep. 40:20-25, Dkt. No. 104-11. *See also* Toya Decl. ¶ 2, Dkt. No. 104-6; Vasquez Decl. ¶ 6, Dkt. No. 117 at 36 of 59. Mr. Vasquez asked if he could take a shower, and Officer Toya replied, "Yeah, finish cleaning and go ahead and jump in the shower." Vasquez Dep. 41:3-6, Dkt. No. 104-11. Mr. Vasquez responded that he was finished and gathered the cleaning supplies. *See* Vasquez Decl. ¶ 7, Dkt. No. 117 at 36 of 59; Vasquez Dep. 41:13-21, Dkt. No. 104-11. At 6:21:17 to 6:22:30 p.m., Officer Toya attempted to open the door from the area marked "Diner" to the corridor, but he had to wait for the HU IB control officer to open the door for him. *See* Pl.'s Resp. ¶ 15, Dkt. No. 117; Ex. K at 6:21:17-6:22:32 p.m., Dkt. No. 106.

Meanwhile, Officer Perez arrived at HU 1B at 6:22:09 p.m. and saw Mr. Vasquez in the diner area. Perez Supp. Decl. ¶¶ 5-6, 8, Dkt. No. 120-2. Mr. Vasquez understood from overhearing Officers Toya and Perez that somebody was having a seizure. *See* Vasquez Dep. 49:1-4, Dkt. No. 104-11; Pl.'s Resp. 6, ¶ 19, Dkt. No. 117. He also knew that usually during the nightshift the facility is short-staffed, so if something happens, they usually lock down the whole facility. Vasquez Dep. 52:22-25, Dkt. No. 104-11.

At approximately 6:22:51, Mr. Vasquez took the supplies to the mop closet. *See* Vasquez Decl. ¶ 8, Dkt. No. 117 at 37 of 59; Ex. K at 6:22:51-6:23:17 p.m., Dkt. No. 106.[2] Officer Perez stood behind Mr. Vasquez and looked at his watch. *See* Ex. K at 6:23:02-6:23:03 p.m., Dkt. No. 106. Mr. Vasquez went to remove a garbage bag that was tied to the fire extinguisher to the left of the G Pod door. *See* Def.'s UF ¶¶ 16, 24, Dkt. No. 104; Ex. K at 6:23:18-6:23:23 p.m., Dkt. No.

---

[2] As shown in the video, Exhibit K, the door to F Pod is off-screen to the lower right, and the door to G Pod is off-screen to the lower left, just to the right of the visible fire extinguisher. Def.'s UF ¶ 16, Dkt. No. 104. *See also* Def.'s Ex. L, Dkt. No. 106.

106. As Mr. Vasquez retrieved the trash bag, Officer Toya stood a few feet behind him with Officer Perez standing a few feet to Mr. Vasquez's left between him and the door to the F-Pod. *See* Def.'s UF ¶ 16; Ex. K at 6:23:19-6:23:23 p.m., Dkt. No. 106. Around this time, Mr. Vasquez told Officer Toya that he was headed to the shower. *See* Vasquez Decl. ¶ 8, Dkt. No. 117 at 37 of 59; Vasquez Dep. 42:4-6, Dkt. No. 104-11. Officer Perez told Mr. Vasquez that there was a situation going on in F pod and that he had to lock down. *See* Vasquez Dep. 42:2-8, Dkt. No. 104-11. With the bag in hand, Mr. Vasquez turned, faced Officer Perez with Officer Toya to Mr. Vasquez's left, and took a step back with his left foot. *See* Ex. K at 6:23:23-6:23:26 p.m., Dkt. No. 106.[3]

Mr. Vasquez asked him to call a supervisor. Vasquez Dep. 42:10-11, Dkt. No. 104-11. After cleaning the restrooms and toilets, he wanted a shower and believed he was entitled to one. *See id.* at 42:14-18; Toya Decl. ¶ 5, Dkt. No. 104-6; Def.'s UF ¶ 51, Dkt. No. 104. Mr. Vasquez believed Officer Perez was messing with him because of the prior rec incident. *See* Vasquez Dep. 44:4-18, Dkt. No. 104-11.

Officer Perez responded, "Are you refusing to lockdown?" Vasquez Dep. 42:11-12. Shaking his head, Mr. Vasquez said, "No, it's not that. Just call a supervisor." *Id.* at 42:13-14. *See also* Ex. K at 6:23:27-6:23:30 p.m., Dkt. No. 106. Mr. Vasquez admits that he asked Officer Perez to call a supervisor three separate times. Def.'s UF ¶ 33, Dkt. No. 104. Officer Perez again asked, "Are you refusing to lockdown?" Vasquez Dep. 42:19-20, Dkt. No. 104-1. Mr. Vasquez replied, "No." *Id.* at 42:21. Officer Perez then pulled out his mace and started shaking the can. *Id.* at 42:21-

---

[3] Based on his training, Officer Perez viewed Plaintiff's step back as taking an aggressive and fighting stance. *See* Def.'s Mot 6, ¶ 34, Dkt. No. 104; Perez Decl. ¶ 8, Dkt. No. 104-5. Plaintiff disputes that he was taking an "aggressive and fighting stance," relying on the video. *See* Pl.'s Resp. 8-9, ¶ 34, Dkt. No. 117. Construing the video with inferences in favor of Plaintiff, a reasonable jury could find that Plaintiff did not take a fighting stance, and that although Plaintiff stepped toward Officer Perez, the move was not aggressive. Accordingly, when considering this motion for summary judgment, the Court will construe this fact in favor of Plaintiff and not consider that Plaintiff was standing in an aggressive, fighting manner.

23; Ex. K at 6:23:37-6:23:40 p.m., Dkt. No. 106. Mr. Vasquez told him, "That don't – that don't fucking scare me." Vasquez Dep. 42:22-23, Dkt. No. 104-11. As an A-Team Responder, Officer Perez needed to attend Inmate AC and could not do so until Mr. Vasquez locked down. Perez Decl. ¶ 9, Dkt. No. 104-5.[4]

Mr. Vasquez, with his hands down at his sides, started leaning on his right foot with his right shoulder turning slightly to the right while he began taking a step with his left foot towards Officer Perez. *See* Ex. K at 6:23:38-6:23:41 p.m., Dkt. No. 106.[5] Officer Perez sprayed him in the face with the mace as he was taking the step for 1-2 seconds. *See* Ex. K at 6:23:40-6:23:42 p.m., Dkt. No. 106; Vasquez Decl. ¶ 10, Dkt. No. 117 at 37 of 59. Officer Perez said, "not scared" as he maced Mr. Vasquez. Vasquez Decl. ¶ 15, Dkt. No. 117 at 39 of 59. Officer Perez then grabbed Mr. Vasquez's shoulders and forced him to the ground. *See* Ex. K at 6:23:41-6:23:44 p.m., Dkt. No. 106. Mr. Vasquez quickly gave up his right hand and put it behind his back. Vasquez Decl. ¶ 13, Dkt. No. 117 at 39 of 59. He did not resist being handcuffed. *Id.* Officer Perez handcuffed him with his arms behind his back while Officer Toya assisted him. *See* Ex. K at 6:23:42-6:23:59 p.m., Dkt. No. 106. Afterwards, Officers Perez, Toya, and Till escorted Mr. Vasquez to the strip enclosure in the G-Pod. *See* Def.'s UF ¶ 54, Dkt. No. 104; Def.'s Ex. L at 6:24:43–6:24:58 p.m., Dkt. No. 106.

---

[4] Plaintiff disputes this factual allegation but without citation to admissible evidence based on personal knowledge. *See* Pl.'s Resp. 7, ¶ 23, Dkt. No. 117. He asserts that only one responder was needed, citing to Lt. Lindsey's Declaration in support. *See id.* Lt. Lindsey's Declaration does not state that only he and medical staff could handle the medical emergency; rather, he says that the team of first responders, including Officer Perez, had the duty to respond to the medical emergency. *See* Lindsey Decl. ¶¶ 6-12, Dkt. No. 104-7. Plaintiff also cites the aforementioned declarations to contend that the emergency was already over. *Id.* But as discussed *supra*, Plaintiff failed to create a genuine dispute of fact as to the timing issue.

[5] Plaintiff denies that he took a step toward Officer Perez. Pl.'s Resp. 15, ¶ 52, Dkt. No. 117. It is clear from the video, however, that Plaintiff started to move his left foot forward in the direction Officer Perez was standing. *See* Ex. K at 6:23:38-6:23:41 p.m., Dkt. No. 106. While Mr. Vasquez may have intended to swing his left foot forward and around back to the G-Pod, at the time he was sprayed, his foot was moving in Officer Perez's direction. *See id.*

### F. A Team response for Inmate AC

Officers Perez, Toya, and Till then reported to Inmate AC's cell. *See* Lindsey Supp. Decl. ¶ 10, Dkt. No. 120-1. For safety reasons, NMCD personnel generally only enter a cell for a potential medical emergency after a team is assembled to ensure the safety of staff and the inmate. *See id.* ¶ 9. At approximately 6:28 p.m., the security personnel entered the cell. *See id.* ¶ 10. The security team restrained the inmate with belly chains and leg irons before medical personnel entered the cell to prevent assaults or injuries to medical personnel. *Id.* ¶¶ 11-12. After medical staff administered Narcan, security personnel carried Inmate AC from his cell and placed him in a wheelchair. *Id.* ¶ 13. Staff took him to the medical unit for treatment at about 6:31 p.m. *Id.*

### G. Plaintiff's medical reports and grievances arising from the incident

Later that night, Mr. Vasquez reported that his back was injured and that he could barely move his stiff neck. *See* Def.'s Ex. P at 7 of 7, Dkt. No. 105-2. On January 11, 2022, he reported to his medical provider that he was experiencing stiff neck muscle pain. *See* Pl.'s Ex. 6, Dkt. No. 117 at 54 of 59.[6]

On January 13, 2022, Mr. Vasquez submitted an Inmate Informal Complaint regarding the incident. *See* Pl.'s Ex. 2, Dkt. No. 117 at 47 of 59. He asserted that officials used excessive force against him when using pepper spray; he was not allowed a reasonable opportunity for decontamination or medical treatment; and they kept him in the strip cage for 45 minutes while he had mace in his eyes. *Id.* Mr. Vasquez subsequently submitted an Inmate Grievance in which he alleged that Officer Perez used excessive force against him "when he deployed OC pepper spray

---

[6] Plaintiff asserts that he "still has medical issues involving his back and neck" and that "the incident caused his emotional distress and psychological issues to be aggravated," citing Exhibit 7 in support. Pl.'s Resp. 22, Dkt. No. 117. Plaintiff does not, however, cite to admissible evidence in support of the allegation that he continues to have back and/or neck pain caused by the incident. Nor does Exhibit 7 support his assertion that the incident caused an aggravation of his mental health injuries. The medical records indicate he received mental health treatment but do not suggest that the incident exacerbated his symptoms. *See* Pl.'s Ex. 7, Dkt. No. 117 at 55-59 of 59. Nevertheless, even if the Court construed these facts in his favor, it would not alter the Court's analysis of the claim.

in [his] face, in violation of use of Force policy, after I requested to talk to a supervisor." Def.'s UF ¶ 68; Pl.'s Ex. 3, Dkt. No. 117 at 48 of 59. The grievance officer denied his grievance after concluding "there were no findings of excessive force." Pl.'s Ex. 4, Dkt. No. 117 at 50 of 59. Mr. Vasquez did not file a separate grievance regarding the alleged denial of the opportunity to decontaminate or the alleged denial of medical treatment. *See* Def.'s UF ¶ 70, Dkt. No. 104; Pl.'s Resp. 17, ¶ 70, Dkt. No. 117. Plaintiff appealed the denial of the grievance and received a decision on his appeal, exhausting his administrative remedies. *See* Def.'s UF ¶ 71, Dkt. No. 104. On appeal, the decisionmaker concluded that Officer Perez took "no wrongful action" and that Mr. Vasquez refused the medical attention offered by Lt. Lindsey and a nurse. Def.'s Ex. J, Dkt. No. 104-8 at 3 of 4.[7]

### III.    PROCEDURAL HISTORY

Plaintiff's Third Amended Complaint asserts one claim for violation of his Eighth Amendment right to be free from excessive use of force. Third Am. Compl. ¶¶ 17-18, Dkt. No. 74. According to his complaint, Officer Perez violated the Eighth Amendment when he sprayed Plaintiff in the face with pepper spray and slammed him to the floor. *See id.* ¶ 18. Defendant moved for summary judgment on this claim. *See* Def.'s Mot., Dkt. No. 104.[8]

### IV.    ANALYSIS

The Eighth Amendment prohibits the infliction of "cruel and unusual" punishment. U.S.

---

[7] Although Plaintiff admits the result of the appeal, he denies that the result or the reasoning was correct. The Court has included this fact to explain the procedures that occurred, but it will conduct its own independent analysis of the excessive force claim.

[8] In his response, Plaintiff reiterates that he "abandoned his claim to his allegation that he was not allowed to decontaminate or that he was not provided medical attention in his Third Amend[ed] Complaint, wherein he claimed only that he had been the subject of excessive force." Pl.'s Resp. 15, ¶ 57, Dkt. No. 117. The Court therefore does not need to address Defendant's argument in his motion for summary judgment that Plaintiff failed to exhaust his administrative remedies on claims that he was denied the chance to decontaminate and denied medical attention. *See* Def.'s Mot. 28-30, Dkt. No. 104. Nor will the Court address the merits of those abandoned claims.

Const. amend. VIII. The "unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). "Among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal quotations omitted). The Tenth Circuit requires a plaintiff to satisfy a two-prong test to prevail on an Eighth Amendment excessive force claim: (1) the wrong was objectively harmful enough to establish a constitutional violation and (2) the prison official acted with a sufficiently culpable state of mind. *Ullery v. Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003)).

Determining what is necessary to meet this standard varies according to the nature of the constitutional violation that is alleged. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In the context of the use of force to keep or restore order, the state-of-mind question "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6 (quoting *Whitley*, 475 U.S. at 320-21); *Giron v. Corrections Corp. of America*, 191 F.3d 1281, 1289 (10th Cir. 1999). Factors relevant to the inquiry include the need for the application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the officer, any efforts made to temper the severity of a forceful response, and the extent of the injury inflicted. *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). As for the objective component, *de minimis* uses of physical force do not amount to a constitutional violation under the Eighth Amendment, "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ullery*, 949 F.3d at 1290 (quoting *Hudson*, 503 U.S. at 9-10).

Prison officials are accorded wide-ranging deference when responding to situations

13

involving the need to preserve internal order and discipline and maintain institutional security. *Whitley*, 475 U.S. at 321-22. Decisions needed to maintain or restore discipline often must be made "in haste, under pressure, and frequently without the luxury of a second chance." *Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320). "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley*, 475 U.S. at 319. The case should not go to a jury unless the evidence, viewed in the light most favorable to the plaintiff, supports "a reliable inference of wantonness in the infliction of pain" under the Eighth Amendment standard. *Id.* at 322.

Here, the Court's resolution of this case focuses on the subjective prong. The record shows that Officer Perez was attempting to respond to a medical emergency involving another inmate, which required locking down the facility. Plaintiff suggests that, because Officer Perez had no medical training, he was not needed at the medical emergency. It is undisputed, however, that Officer Perez was an A-Team Responder. As such, he had the duty to go to the location of the medical emergency. Delays in his responding presented a potential medical threat to the other inmate. Mr. Vasquez understood somebody was having a seizure, and he knew the lockdown was typical in this situation during the night shift. He also admits that, despite that knowledge, he repeatedly requested that Officer Perez call a supervisor. Plaintiff also admits that, when Officer Perez removed his can of pepper spray, Plaintiff said, "that don't fucking scare me," an expression indicating non-compliance.

According to Plaintiff, he complied with the order but wanted to be sure a supervisor would allow him to take a shower later. *See* Pl.'s Resp. 13-14, Dkt. No. 117. The Court, however, disagrees that the evidence, even construed with inferences in Plaintiff's favor, shows compliance. Although Plaintiff said he was not refusing to lockdown, he did not through his words or actions

indicate a willingness to lockdown as directed. Instead of agreeing to lockdown or moving towards the G Pod, he instead asked Officer Perez to call a supervisor repeatedly. *See* Vasquez Dep. 56:1-5, Dkt. No. 104-11 (admitting that three separate times he asked to call a supervisor). Although he began to take a step forward at the same time Officer Perez sprayed him, it is not apparent from the video that his step or other body language showed that he intended to comply. Rather, the evidence shows he failed to comply with directives to lockdown during an emergency that he understood was occurring. Inmates "cannot be permitted to decide which orders they will obey, and when they will obey them." *Redmond*, 882 F.3d at 938. Defendant has therefore shown a need to use force to gain Plaintiff's compliance with the lockdown measures.

As for the level of force employed, Officer Perez sprayed the mace in Plaintiff's face for only 1-2 seconds, forcibly took him down to the ground, and immediately handcuffed him and took him to a secure area. No other force was used, demonstrating a close relationship between the need and the amount of force applied to quickly restrain Plaintiff. While Plaintiff sustained pain and reddened eyes from the pepper spray, a sore back, and a stiff neck, he suffered no other injuries from the take down. The extent of his injuries was not so great as to show sadistic intent. Although even minor injuries can sustain an Eighth Amendment claim, this is not a case where an officer applied force without any justification and merely to cause harm. *Cf. Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (explaining that, while the extent of injury suffered is one factor in analysis, inmate gratuitously beaten by guards does not lose ability to pursue excessive force claim merely because he escaped without serious injury). Rather, the use of pepper spray here was to maintain discipline and to quickly secure Plaintiff so that Officer Perez could respond to the medical emergency.[9]

---

[9] The cases cited by Plaintiff do not warrant a different result. Cases relied upon by Plaintiff where prison guards applied force without any justification are inapposite, as they did not involve the emergency situation Officer Perez

Accordingly, even viewing the evidence in the light most favorable to Plaintiff, the record does not support a reasonable inference of wantonness in the infliction of pain to meet the Eighth Amendment standard. Defendant is therefore entitled to summary judgment on this claim. *Cf. Redmond*, 882 F.3d at 933, 937-38 (concluding that officials needed to use force and that it was not disproportionate to use tear gas to subdue agitated, unarmed inmate who locked himself inside recreation yard and refused to comply with prison officials' orders, even though gas inadvertently filtered into prison and affected other prisoners); *Grissom v. Roberts*, 435 F. App'x 717, 718-19, 721 (10th Cir. June 9, 2011) (affirming district court's dismissal of plaintiff's Eighth Amendment excessive force claim where prison official used pepper spray against plaintiff and forcibly removed him from cell after inmate resisted order to be restrained, responded obscenely, and threw water at officer); *Green v. Corrections Corp. of America*, 401 F. App'x. 371, 376 (10th Cir. 2010) (concluding that use of pepper spray was not excessive where plaintiff admitted to physically restraining another prisoner immediately before prison official sprayed him with pepper spray, so force was reasonable to maintain or restore discipline); *Gargan v. Gabriel*, 50 F. App'x. 920, 923 (10th Cir. Nov. 5, 2002) (unpublished) (holding that plaintiff failed to state Eighth Amendment

---

faced here. *See*, *e.g.*, *Mitchell v. Maynard*, 80 F.3d 1433, 1440-41 (10th Cir. 1996) (concluding that plaintiff did not need to allege significant physical injury to state cause of action where facts show that, after plaintiff, who was naked and shackled, tripped and fell, guards beat him with night sticks while shouting racial epithets at him, even though he had not acted inappropriately or posed any disciplinary problem or threat); *Treats v. Morgan*, 308 F.3d 868, 872-75 (8th Cir. 2002) (concluding plaintiff satisfied burden on summary judgment to show excessive force based on guard's use of pepper spray without warning where inmate questioned action but otherwise was not recalcitrant or threatening; no emergency situation existed). The Fourth and Fourteenth Amendment cases relied upon by Plaintiff are likewise distinguishable because they utilize a different standard than cases brought under the Eighth Amendment and/or involved very different facts. *See*, *e.g.*, *Estate of Booker v. Gomez*, 745 F.3d 405, 409, 418-29 (10th Cir. 2014) (concluding Plaintiff met burden to show violation of Fourth and Fourteenth Amendments after restrained, non-resisting pretrial detainee died following pressure on his back, use of Taser, and use chokehold for over two and a half minutes); *Martinez v. New Mexico Dep't of Pub. Safety*, 47 F. App'x 513, 515-17 (10th Cir. July 29, 2002) (finding excessive use of force under Fourth Amendment where officer maced driver during traffic stop even though she was not actively resisting arrest or attempting to evade arrest by flight); *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1190-91 (9th Cir. 2000) (Fourth Amendment excessive force case involving use of pepper spray on protesters).

excessive force claim where officers sprayed unarmed prisoner secured in his segregation cell with pepper spray four times to aid his extraction from cell where plaintiff alleged no facts to support reliable inference that pepper spray was used unnecessarily, excessively, or wantonly).

Plaintiff cites NMCD Policy CD-130601 A.2 ¶ 21, which states that staff should only use force as a last resort. *See* Pl.'s Resp. 9, Dkt. No. 117. He argues that, instead of using pepper spray, Officer Perez could have called a supervisor or directed that he turn around to get handcuffed. Violation of a policy, however, does not amount to a constitutional violation. *See*, *e.g.*, *Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) ("violation of a prison regulation does not give rise to an Eighth Amendment violation absent evidence the prison official's conduct failed to conform to the constitutional standard") (quoting *Jolivet v. Cook*, 48 F.3d 1232 (10th Cir. 1995)); *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("a failure to adhere to administrative regulations does not equate to a constitutional violation"). While other more minimal uses of force may have been available, that is not the standard under the Eighth Amendment. Officer Perez believed that he needed to use force to gain compliance to get to the emergency quickly. A court should not second-guess instantaneous, on-the-spot decisions, so long as they do not constitute the unnecessary and wanton infliction of pain. *See Winter v. Mansfield*, No. 21-3171, 2022 WL 3652464, at *10 (10th Cir. Aug. 25, 2022) (quoting *Sampley v. Ruettgers*, 704 F.2d 491, 496 (10th Cir. 1983)). For all the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's Eighth Amendment excessive force claim.

Alternatively, in light of the aforementioned law permitting the use of pepper spray to gain control of a resistant inmate, Defendant is entitled to qualified immunity. *Cf. Grissom v. Palm*, No.

17

21-3194, 2022 WL 3571410, at *6 (10th Cir. Aug. 19, 2022) (concluding that qualified immunity applied because officer's use of handcuffs and pepper spray in attempting to subdue inmate failed to qualify as malicious and sadistic uses of force, rather than good faith efforts to maintain or restore discipline, given circuit decisions rejecting excessive-force claims where one or more corrections officers used force to gain control of resistant prisoner).[10]

      **IT IS THEREFORE ORDERED** that Defendant's *Motion for Summary Judgment* (**Dkt. No. 104**) is **GRANTED**. This case is therefore **DISMISSED with prejudice**.

SENIOR UNITED STATES DISTRICT JUDGE

---

[10] Defendant argues that Plaintiff did not administratively exhaust the excessive force claim based on forcing him to the ground before handcuffing him. *See* Def.'s Mot. 15, ¶ 76, Dkt. No. 104; Reply 8, Dkt. No. 120. Neither Plaintiff's informal complaint nor his formal grievance alleged that slamming him to the ground constituted excessive use of force; instead he asserted that he was subjected to excessive use of force when Officer Perez used pepper spray against him. *See* Pl.'s Ex. 2 & Ex. 3, Dkt. No. 117 at 47-48 of 59. In his Step 5 Departmental Appeal, however, Plaintiff raised the issue of Officer Perez "going hands on in violation of use of force policy." Def.'s Ex. J, Dkt. No. 104-8 at 4 of 4. The Court declines to consider this exhaustion argument, given that it has already determined that the claim does not survive summary judgment or qualified immunity on the merits.